## Julius Suehr, Appellee, v. Sanitary District of Chicago, Appellant.

### Gen. No. 5,078.

1. DAMAGES—*what evidence competent in action for injury to real property.* In an action for injury to real property caused by the increased flow of water due to the act of the defendant, evidence tending to show the resulting damage up to the time of the trial is competent.

2. DAMAGES—*what evidence competent in action for injury to real property.* In an action for injury to real property caused by the increased flow of water due to the act of the defendant, proof is best made by showing the manner in which the market value was in fact depreciated by actual results rather than by offering the opinions of witnesses based upon their conclusions as to what the effect would be.

3. DAMAGES—*when instruction in action for injury to real property not erroneous.* In an action for injury to real property caused by the increased flow of water due to the act of the defendant, an instruction which does not make an express reference to the date or time at which the depreciation shall be estimated, held not ground for reversal.

4. INSTRUCTIONS—*when failure to refer to the evidence will not reverse.* Held, that an instruction upon the question of damages which was deficient in not instructing the jury to base their award upon what they might find from the evidence, was not ground for reversal.

Action on the case. Appeal from the Circuit Court of La Salle county; the Hon. EDGAR ELDREDGE, Judge, presiding. Heard in this court at the October term, 1908. Affirmed. Opinion filed June 10, 1909.

WALTER REEVES, B. F. LINCOLN and WALTER E. BEEBE, for appellant; JOHN C. WILLIAMS, of counsel.

BUTTERS, ARMSTRONG & FERGUSON, and O'DONNELL & DONOVAN, for appellee; A. E. BUTTERS and J. L. O'DONNELL, of counsel.

MR. JUSTICE WILLIS delivered the opinion of the court.

This was an action of trespass on the case brought by Julius Suehr, appellee, against the Sanitary District of Chicago, appellant, to recover damages for injuries to his real estate, caused by the construction and use of the drainage channel of appellant and the flow of water from Lake Michigan through said channel into the Des Plaines river and thence into the Illinois river. Appellee's real estate here in question consisted of an island of about eleven and one-half acres of tillable land, situated in the Illinois river near the city of Ottawa in LaSalle county and reached to the center thread of the current on each side thereof. The claim of appellee was that the waters from the drainage channel of appellant so increased the waters of the Illinois river that they overflowed this real estate and destroyed the ford leading thereto and caused a damage thereto and to the crops planted and growing thereon, and by these means greatly depreciated its value. There was a plea of the general issue to the amended declaration, and, upon a jury trial, a verdict was returned in favor of appellee in the sum of $4,000. A motion by appellant for a new trial was overruled and judgment was entered upon the verdict. Defendant below prosecutes this appeal from said judgment. Attorney's fees were ordered taxed, and that taxation is not questioned upon this appeal.

Julius Suehr, the appellee, was a gardener, who learned his trade in Germany. He came to this country in 1868 and, with the exception of two or three years, has worked at his trade ever since. He has devoted himself especially to the raising of asparagus, having had experience in the planting and raising of that vegetable in Germany under instructions from his father, and having raised asparagus on one farm near Ottawa for about twenty-five years. In 1897 he bought the island described in the declaration. This island contained about eleven and one-half acres of tillable land and nearly fifteen acres in all, which was sur-

rounded by a fringe of trees on a portion thereof and had low shores extending down to the water. It was separated from the main land by a narrow channel of water, which at times of low water was about knee deep and was easily fordable. The soil varied from eight to fourteen feet in depth, and was a warm sandy loam and has sub-drainage, and prior to 1900 shells and dead fish were deposited thereon by the winter and spring floods. It needed no fertilizer, and produced corn to the amount of about seventy-five bushels per acre during the ten years next preceding its purchase by appellee. Suehr planted eleven and one-half acres of this island with asparagus (which some witnesses called "grass") and cultivated the same during the succeeding years up to the year 1900, when, he testified, he had a perfect stand of that crop. On the 17th day of January, 1900, the drainage channel of the Sanitary District of Chicago was opened and the water therefrom was emptied into the Des Plaines river and flowed from thence into the Illinois river. The proof shows that from that time on the island in question was seriously affected by the increased flow of water in the Illinois river: that a part of the island was washed away, including the timber along the edges; that the average stage of water in summer has been very high upon the edges of the island; that the spring floods recede slowly and late, and that by reason of submerging and washing away of the soil the tillable land on the island was reduced to about seven and one-half acres up to 1907. The capacity of the rock channel of the Sanitary District is 600,000 cubic feet per minute, and when the population of Chicago reaches 2,000,000, the statute requires that the channel shall carry that volume of water. Because of the narrowness of the Chicago river the Secretary of War issued an order limiting the flow to 300,000 cubic feet and afterwards to 250,000 cubic feet per minute throughout the twenty-four hours of the day. The Sanitary

District is now engaged in widening the Chicago river in order to remove the cause for the orders made by the Secretary of War, and when that work is completed it is expected by the Sanitary District that it will be permitted to flow all the water which its earth channel will convey, which is 480,000 cubic feet per minute. The proof strongly tends to show that when that has been done, the higher stages of the water and the increased force of the current will destroy or at least render practically valueless the island in question.

It is conceded that the damage which the construction and use of the drainage channel and the flow of the water through the same into the Des Plaines river and thence into the Illinois river occasioned to the real estate of appellee was the depreciation thereby caused to its fair cash value. Appellant contends that such depreciation in the fair cash market value of appellee's real estate was completely determined and fixed on January 17, 1900, the date when the water was first allowed to flow through such drainage channel into the Des Plaines river; that in law no damage was caused by appellant to appellee's real estate after January 17, 1900; that evidence of the physical damages done to appellee's land after January 17, 1900, by the waters of the Illinois river, including the waters from the drainage channel, during all the seven years intervening between the time of the first turning in of the water from the drainage channel and the time of the trial of this case, was incompetent and was improperly admitted; and that being incompetent, there was no competent evidence introduced by appellee to show any damage to such real estate, and therefore the jury should have been instructed at the close of appellee's evidence to find appellant not guilty. On principle it would seem as if such evidence is competent. It puts the proof on a much more satisfactory basis to show the exact condition that has resulted from the flow of the water, and how the market value has in fact been affected by the flow of the water turned into

the river from the drainage channel, than to confine
the evidence to the opinions of witnesses as to the
effect likely to result from the turning in of the water,
basing such opinions entirely upon the state of facts
existing on January 17, 1900, when none of the water
turned in on that date at Chicago had yet reached
this island in the river near Ottawa. The rule that
there can be but one recovery for the deterioration in
the value of real estate caused by a structure of a per-
manent character, and that all damages for past and
future injury to the property must be recovered in
one action, is laid down in C. &. E. I. R. R. Co. v. Loeb,
118 Ill. 203, and C. & E. I. R. R. Co. v. McAuley, 121
Ill. 160.

K. & S. R. R Co. v. Horan, 131 Ill. 288, was a suit to
recover for permanent injury to real estate by the
erection of a structure, and it was held that the depre-
ciation in the market value of the land arising from
that permanent structure was the proper measure of
damages to the owner. It would seem from an exam-
ination of that opinion and of the opinion of the Ap-
pellate Court in the same case, that evidence must
have been admitted showing the harmful effect that
the structure afterwards had upon the land. A judg-
ment for plaintiff was affirmed.

Springer v. City of Chicago, 135 Ill. 552, was a suit
to recover damages caused to real estate of Springer
by the construction of a certain viaduct and approach
thereto. The depreciation, if any, in the fair cash
market value of the property immediately before and
immediately after the construction of the improve-
ment was held to be the true measure of damages; yet
it was held there that evidence of the condition of
the property at the time of the trial was competent,
and that the parties had the right to show the value
of the property at the time of the trial, as such evi-
dence would have a bearing on the value of the prop-
erty before and after the alleged damage, and there-
fore that the court properly allowed the jury to visit

the premises and in that manner see for themselves the condition of the property at the time of the trial.

Penn. Mutual Life Ins. Co. v. Heiss, 141 Ill. 35, involved the question of damages to certain property by the construction of a railroad in a street. It was held that the right of action accrued at the completion of the road to recover not only present but prospective damages. It was held that the action could be brought at any time within five years after the accruing of that right; and the court said: "The railroad company or appellants cannot complain that the plaintiff has waited until his damages have become susceptible of absolute proof before bringing his action, instead of resorting to proof of prospective damages. The authorities are that whenever the suit is brought, if within the statute of limitations, proof may be made of the permanent damages to the property, and the recovery being once and for all may include all damages flowing from the location and ordinarily skillful operation of the road."

City of Centralia v. Wright, 156 Ill. 561, was a suit by Wright to recover damages to certain lands caused by the construction of a dam across a stream. It was held that the structure was to be treated as permanent and lawful, and that plaintiff was entitled to recover in one action all past, present and future damages. Of course in the eye of the law the value of the real estate was depreciated, and the amount of that depreciation was fixed, when the dam was completed, yet the opinion shows that the plaintiff was allowed to prove that as a subsequent result of the construction of the dam the water was three feet and eight inches deep at the ford where plaintiff had been accustomed to cross the water to reach his premises, and that it spread out sixty feet wide, and that when the creek was raised by rains his lands were overflowed.

Galt v. C. & N. W. Ry. Co., 157 Ill. 125, was a case where a railroad had occupied a street in front of certain land many years, and then laid an additional

track after appellant bought said land. It was held that the laying of such additional track was an element tending to enhance the damages and which the grantor of appellant had a right to anticipate, and for which he could have recovered if he had brought an action. It was held that damages of that character were prospectively recoverable by his grantor, and that the damages likely to flow from the occupation of the street by the railroad company must be presumed to have been anticipated, and for them a recovery could have been had by appellant's grantor. Therefore it was fair to presume that he bought the premises at a reduced price on that account.

Hyde Park Light Co. v. Porter, 167 Ill. 276, was an action on the case brought by Porter to recover damages for the depreciation in value of his lot and residence by the electric light plant of appellant adjoining it. It was contended that no proof had been introduced of any injury to the premises up to the day the suit was begun. The opinion shows that there was much evidence that by the operation of the plant soot, smoke, steam, ashes and cinders had been cast upon plaintiff's property, and that jarring and vibration resulted from the operation of the plant and materially damaged the plaintiff's property. It is a fair inference from the language of the opinion that much of this proof related to a time after the suit was begun. The court said: "If plaintiff was entitled to recover at all, as he was confined to a single action, he ought to recover whatever damages he has sustained by reason of the plant, both present and future damages. If he was confined to the damages sustained between the time when appellant commenced operating the plant and the date the action was commenced, he would be denied all substantial relief. Such is not the object of the law. If he has a remedy, that remedy should afford adequate relief for the damages sustained."

Sanitary District of Chicago v. Conroy, 109 Ill. App.

367, was a suit like this, to recover damages to real estate alleged to have been caused by the waters of the Sanitary District channel. It was held that the true measure of damages was the diminution in the market value of the property caused by the act of the Sanitary District in turning in the water. The opinion, however, shows that the subsequent effects of the turning of the water into the channel was allowed to be proven, as well as the value of the premises before and after the water was turned in, and proof that the river had been higher since October 2, 1902, than it was at that time was held competent testimony. In view of these authorities we are of opinion that it was competent for appellee to show the results of the action of the water upon his land after January 17, 1900, and that this absolute proof of the manner in which the market value of the property was in fact depreciated by actual results was preferable to the mere opinion of the witnesses based upon their conclusions as to what the effect would be. Suppose, for example, that, if the suit had been brought and tried immediately after the water was turned in, and before it had reached this island, it would have been the opinion of the witnesses for appellee that it would not raise the waters about this island more than one foot, and would do no substantial injury thereto, would not such speculative proof be much less satisfactory than the testimony of witnesses who a year or two later ascertained by actual measurement how many feet the water did rise about the island after the waters were turned in? We conclude that no substantial error in that respect appears in this record.

Appellant contends that the court below erred in giving the second instruction offered by appellee. This instruction as given is as follows:

"If you believe from the evidence that defendant, on January 17, 1900, turned into the Des Plaines river a quantity of water which thence flowed into the Illinois river, and that such water caused the land of the

plaintiff described in his declaration to be decreased in its fair cash market value, then you will find defendant guilty and award to plaintiff such damages, if any, as will compensate him for such depreciation, if any, in the fair cash market value of his land.''

It is the contention of the appellant that, by this instruction, no time was fixed at which to measure the depreciation, if any, in the fair cash market value of the land caused by the injury complained of, and, also, that this instruction permits the jury to award the plaintiff such damage as, in their judgment, will compensate him, instead of requiring the jury to award the plaintiff what they may find *from the evidence* the depreciation in the fair cash market value of the land to have been at the time the injury was committed because of the act of the defendant complained of. The instruction above quoted may be somewhat deficient in not making any express reference to the date or time at which the depreciation shall be estimated, but the instruction does not give any improper date and does not conflict with the fifth instruction given on behalf of appellant, which does contain the date, the absence of which is complained of in this instruction. Said instruction is also somewhat deficient in not instructing the jury to base their award upon what they may find ''from the evidence'' but several of the instructions given for appellant and the fourth instruction given for appellee told the jury that it was their duty to decide the case upon the evidence and that they had no right to go outside the evidence in arriving at a conclusion upon any question of fact. We think that the defects in this instruction are completely cured by other instructions and that when the instructions are considered as a series it will be seen that there was no error in the giving of the second instruction for appellee.

Appellant contends that the verdict is so excessive that it ought not to be permitted to stand, and in considering this question it becomes necessary to refer

somewhat particularly to the evidence on both sides as to the value of the island, both before and after the increase in the flow of water, with especial reference to the particular use to which the land had been put by its owner. The island was purchased by appellee in 1897 for $850. Between that time and the 17th of January, 1900, appellee had planted almost the entire acreage of the island to asparagus. The proof introduced by appellee tended to show that it cost $30 per acre to purchase the roots for the highest priced asparagus, such as this was; that it cost about $75 per acre the first year and $60 per acre the second year to tend the crop, with but little returns during those years; that it required from five to ten years to completely mature the planting so as to produce a full crop, and that once a full stand is obtained in soil of suitable depth and drainage, replanting is not required for many years, sometimes not for twenty-five or thirty-five years. There was also proof that a warm sandy loam is the best soil for asparagus; that the plant will grow to the depth of as much as fifteen feet in the ground, if there is that depth of soil; that the depth of the soil of from eight to fourteen feet added a very great value to this land for this use, and that but little soil so deep could be found about Ottawa. The annual spring overflow acted as a sufficient fertilizer, so that the usual expense and labor of an annual renewal and enrichment of the soil with manure was unnecessary. All of the witnesses agreed that the planting of such a crop had considerably increased the value of the land. But in their estimates of such increase of value these witnesses were very far apart. The witnesses for appellee placed the value of the island on January 11, 1900, at from $800 to $1500 per acre, while the witnesses for appellant fixed its value at from $180 to $250 per acre. Ten witnesses testified for appellee. Nine of these were gardeners of long experience, one having been engaged in that work for thirty-five years, another for

at least thirty years, and nearly all of the others from ten to twenty-five years. Of the eight witnesses for appellant on the subject of values, three were gardeners, three were farmers, and the others merely claimed to have knowledge of land values in the vicinity by reason of being engaged in the real estate business or because of long acquaintance with the land in question. The length of experience had by the witnesses for appellant in regard to the planting, raising and value of asparagus was very much less than that had by the witnesses for appellee, and a careful analysis of the testimony on both sides on this question leads the court to the conclusion that the values given by appellee's witnesses are better founded and more nearly correct. In view of the fact that the soil of this island was of very great depth, and was peculiarly adapted to the raising of asparagus, that its facilities for irrigation were excellent, that according to law and the ruling of the Secretary of War a large increase in the flow of water may be looked for in the not very distant future, that the increase in the water of the river caused by the opening of the drainage channel of appellant has already destroyed the ford by which this island was formerly reached and made it less accessible, that the island has already been much diminished in size by the action of the water, and that a further diminution and perhaps entire destruction may reasonably be expected, that appellee had spent three years in fitting the land for asparagus and getting in a perfect stand of that vegetable before 1900, that the crop of asparagus planted by appellee was of a permanent character and that no gardener testifying could place a limit on the time during which said crop would continue to produce a marketable article of asparagus without replanting or resetting, that considerable skill and experience are required in the planting and cultivation of such a crop as asparagus, and have been expended upon this land by appellee after he bought it, that the estimates as

to value and depreciation given by appellee's witnesses are made by men of long experience in that kind of work, and that the land is close to an important market in the large city of Chicago, we do not feel that we can say that the verdict of $347.82½ per acre (as this is) for the tillable land was excessive or was without sufficient evidence to sustain it.

We find no reversible error in the record, and the judgment will therefore be affirmed.

*Affirmed.*